## Commonwealth v. Wilkins

460

C.P. of Lawrence County, no. 1180 of 2004.

*Jeffrey Baxter, senior deputy attorney general,* for Commonwealth.
*Carmen F. Lamancusa,* for defendant.

COX, *J.,* January 18, 2007—Defendant in the instant case, Thomas R. Wilkins, has filed an appeal pertaining to the order of this court denying defendant's motion for new trial dated November 17, 2006, to the Superior Court of Pennsylvania.[1] On September 22, 2004, Agent Gregory S. Smith of the Pennsylvania Attorney General's Office filed a criminal complaint against defendant Thomas R. Wilkins with Magisterial District Judge J.V. Lamb, Magisterial District 53-3-02.[2] Subsequently, de-

---

1. The court notes that a Pa.R.A.P. 1925(b) order was not issued upon defendant, as this court has already considered post-trial motions concerning the same issues raised. This court believes it can provide a proper analysis of its position to the Superior Court without a statement of matters complained of from the defendant.

2. Initial charges brought against defendant included: "Medicare fraud" 62 P.S. §1407(a)(6) (accomplice liability) (11 counts); "prescription by physician not in accordance with treatment principles accepted

fendant was arrested on September 23, 2004, pursuant to the criminal complaint and warrant for arrest issued by Magisterial District Judge Lamb. On April 10, 2006, a jury trial commenced involving co-defendants Philip Wagman and Thomas Wilkins. Then, on May 9, 2006, defendant was convicted of 19 counts of prescription by physician not in accordance with treatment principles accepted by a responsible segment of the medical profession of the Controlled Substance Drug Device and Cosmetic Act[3] as an accomplice, and one count of conspiracy.[4] On July 24, 2006, defendant filed a motion for judgment of acquittal and motion for new trial and arrest of judgment. Oral argument on the motions was held on October 10, 2006. On November 17, 2006, this court denied said motions.

## FACTUAL BACKGROUND

Defendant Thomas Wilkins graduated from the Palmer School of Chiropractic, a renowned school with campuses located throughout the United States. Upon graduating and passing his licensing board exam, defendant became a sole practitioner in New Castle, Pennsylvania. Ms. Shelley Hudson, who began working for Dr. Wilkins in 1998, explained that in the year 2000, Dr. Wilkins was treating approximately five to 10 patients per day and was ready to terminate his practice. However, through unclear means, Dr. Wilkins met Dr. Philip

---

by a responsible segment of the medical profession, Controlled Substance, Drug Device and Cosmetic Act" 35 P.S. §780-113(a)(14)(iii) (accomplice liability) (19 counts); and "conspiracy" 18 Pa.C.S. §903(a) (1) (2 counts).

3. 35 P.S. §780-113(a)(14)(iii).

4. 18 Pa.C.S. §903(a)(1).

Wagman, a pain management physician and, in hopes to keep his practice afloat, asked him to join his practice. Ms. Hudson testified that Dr. Wagman did indeed join the practice in April of 2001, and from that time forward, the practice grew exponentially. Ms. Hudson explained the explosive growth and testified that at the height of the practice, the doctors were treating approximately 118 patients per day. To further corroborate Ms. Hudson's testimony, Agent Gregory S. Smith explained that surveillance of the practice exhibited its wide spread nature; patients were traveling to the practice from areas as far north as Erie to areas south of Pittsburgh and throughout Ohio. Additionally, Agent Smith testified that patients were also carpooling to their appointments and leaving together with prescriptions in hand. Also, the office was always crowded and, at times, there were people standing outside waiting to see the doctors.

Testimony from multiple witnesses also identified the relationship of the doctors. There were signs posted throughout the office that clearly required all patients who wished to see Dr. Wagman first receive treatment from Dr. Wilkins. Mr. John Lee, an ex-patient of the doctors, testified that he overheard a discussion between Dr. Wagman and Dr. Wilkins in which Wagman stated, "You got to love this—$2,500 per day." Also, there was testimony that explained the office staff performed duties for both doctors.

Testimony concerning the treatment practices of the doctors demonstrated their lack of desire to administer needed medical treatment, but rather provided it to increase their personal financial gain. Although Dr. Wilkins prescribed x-rays or MRIs for new patients without previous medical treatment, the results often indicated minor

abnormalities, if any, that questioned the need for chiropractic treatment, and certainly revealed no need for immediate pain management treatment. Further, Dr. Dennis Corbett, the Commonwealth's chiropractic expert, illustrated the gross deviations in the length of treatment provided to patients, often exceeding guidelines by several months.

Additionally, Dr. Corbett questioned Dr. Wilkins' failure to refer a patient to their primary care physician for treatment before introducing him or her to a pain management doctor. Dr. David Evanko, the Commonwealth's expert on pain management, further corroborated this testimony, claiming that a pain management physician treats patients with chronic pain who are unable to obtain relief through another medical specialty. Dr. Evanko testified that Dr. Wagman did not provide pain management treatment in accordance with treatment principles accepted by any responsible segment of the medical profession. Rather, Dr. Wagman prescribed narcotic medications on his patients' initial visits without determining whether non-narcotic treatment or other types of therapy would be proper or successful. Thus, Dr. Evanko concluded that Dr. Wagman was engaged in a practice in which he was improperly prescribing narcotic medication. Moreover, even though these patients were receiving both chiropractic and pain management treatment, most claimed minimal, if any, improvement.

Also, Dr. Wagman's treatment dictated the length of time a patient would receive chiropractic treatment. Mr. Lee testified that there were times he would be receiving treatment from Dr. Wilkins when Dr. Wagman identified him as his next patient, and the chiropractic treatment would stop. More importantly, the record shows a lack

of correspondence between the doctors, demonstrating Dr. Wagman's practice consisted of prescribing narcotic medications without tests or physical therapy.

As a result of these findings of fact, the jury concluded that Dr. Wilkins was clearly involved with the criminal acts carried out by Dr. Wagman and, therefore, found him guilty on the previously stated counts. For the following reasons, this court contends its decision to uphold the jury verdict and deny defendant's motion for a new trial should be affirmed:

## I. *Sufficiency of Evidence*

This court will first address defendant's challenge that the sufficiency of the evidence does not support the verdict and sentence imposed. This court contends the verdict and sentence is clearly supported by ample evidence to sustain the conviction. Therefore, this court asserts that its decision to deny defendant's motion for new trial on the basis that there was sufficient evidence to uphold the jury verdict should be sustained.

In Pennsylvania, the appellate court's standard of review in regards to a sufficiency claim is: "whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt . . . [the appellate court] may not weigh the evidence and substitute [its] own judgment . . . [additionally] the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding [appellant]'s guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be

drawn from the combined circumstances." *Commonwealth v. Lewis,* 911 A.2d 558, 563 (Pa. Super. 2006). (citations omitted) Additionally, the Commonwealth may satisfy its burden of proof by demonstrating all elements of the crime solely through circumstantial evidence. *Id.* quoting *Commonwealth v. Gooding,* 818 A.2d 546, 549 (Pa. Super. 2003), *appeal denied,* 575 Pa. 691, 835 A.2d 709 (2003).

In the case at hand, the appellate court must view all evidence presented during the trial in the light most favorable to the Commonwealth since it was the verdict winner. Therefore, the court must determine whether the evidence and all inferences deducible from it, when viewed in the light most favorable to the Commonwealth, are sufficient to support the elements of accomplice liability and conspiracy charges beyond a reasonable doubt.

### a. Accomplice Liability

To find a person guilty of accomplice liability under 18 Pa.C.S. §306, a two-prong test must be satisfied: (1) there must be evidence which demonstrates the defendant intended to facilitate or promote the underlying offense, and (2) there must be evidence showing the defendant actively participated in the offense by aiding, soliciting, or agreeing to aid the principal. See *Commonwealth v. Kimbrough,* 872 A.2d 1244 (Pa. Super. 2005). This court acknowledges that defendant correctly sets forth the law regarding complicity, asserting that a person may not be charged as an accomplice to a crime merely because he is present at the scene or has knowledge that the crime is being committed. See *Commonwealth v. Henderson,* 249 Pa. Super. 472, 378 A.2d 393 (1977). Rather, the

defendant must have knowledge of the crime and actually be an active partner with the intent to commit the crime. *Commonwealth v. Brady*, 385 Pa. Super. 279, 560 A.2d 802 (1989).

In determining whether defendant was an accomplice in the violation of 35 P.S. §780-113(a)(14), this court must first determine whether defendant acted with the intent to promote or facilitate in the commission of the crime. Unlike criminal conspiracy, there is no requirement to show that defendant reached an agreement with the principal to find accomplice liability. See *Commonwealth v. Allen*, 425 Pa. Super. 615, 625 A.2d 1266 (1993). *Id.* Rather, a "mere rendition of aid is sufficient," *id.*, and this requirement is satisfied by the least degree of concert or collusion between the accomplice and principal. *Commonwealth v. Potts*, 388 Pa. Super. 593, 566 A.2d 287 (1989).

This court opines that the circumstantial evidence presented during trial clearly demonstrates that it was defendant's intent to promote and facilitate in the commission of the underlying crime and, therefore, satisfies the first prong of the test. The facts illustrate that:

(a) Defendant sought a pain management doctor to become part of his practice and help increase business.[5]

(b) After the inclusion of a pain management doctor into the practice, the patient count increased to remarkable levels in a short period of time.[6]

---

5. During trial, Ms. Shelley Hudson provided testimony in which she explained that Dr. Wilkins told her that he was bringing in a pain management doctor to increase the number of patients.

6. Testimony provided by Shelley Hudson illustrates the explosive growth of the practice. Ms. Hudson testified that prior to co-defendant

(c) Although defendant maintains that his practice was separate and distinct from that of the pain management doctor, the facts demonstrate that signs throughout the office stated, "Chiropractic treatment is required in order to see the pain management doctor" and "Narcotics would only be prescribed to active chiropractic patients," suggesting the doctors had a more intimate relationship than what is claimed.[7]

(d) Both doctors required the assistance of the same office personnel, again indicating a closer relationship existed than what defendant admitted.

(e) Defendant continued to treat patients well beyond the normal treatment times as suggested by the chiropractic standard and saw minimal, if any, improvement in his patients.

(f) Defendant would immediately refer patients to the pain management doctor before evaluating the success of non-medicated treatment, such as continued chiropractic treatment and recommended home exercises.

(g) Defendant continued to provide treatment and allow pain management treatment even after x-rays and MRIs showed unremarkable conditions.

(h) If Dr. Wagman terminated a patient relationship, treatment with defendant would cease also, once again indicating a closer relationship existed than what is claimed.

---

Dr. Wagman joining the practice, defendant was treating approximately five to 10 patients per day. However, once Dr. Wagman joined the practice, the number of patients began to increase and, at its busiest time, the office treated approximately 118 patients in one day

7. Additionally, a patient, Anthony Villani, testified that he was required to pay defendant even if he was not treated by him on the day he went to the office.

Defendant, on the other hand, contends that the only evidence, if any, that demonstrates an intent to promote or facilitate the commission of the crime was a statement overheard by John Lee, in which Dr. Wagman stated to defendant, "You got to love this—$2,500 per day." Defendant argues that Mr. Lee's testimony was impeached several times during trial and, therefore, should not have been considered by the jury. However, this assertion is incorrect. "The trier of fact, while passing on the credibility of witnesses . . . is free to believe all, part or none of the evidence." *Kimbrough, supra*, 872 A.2d at 1251. Therefore, the jury was free to assess and believe the testimony of Mr. Lee and rightfully consider the statement he overheard when determining the defendant's guilt. The court finds that based upon these findings, the first prong of the test to find accomplice liability is satisfied.

Next, to find defendant guilty of accomplice liability, it must be shown that he aided, agreed to aid, or solicited the principal in the planning or commission of the crime. As this court previously identified, defendant immediately recommended patients to Dr. Wagman before providing more extensive chiropractic treatment. Dr. Dennis Corbett, the Commonwealth's expert witness on chiropractic treatment, testified that this was clearly against established protocol.

Defendant contends that there can be no finding that he aided in the commission of the crime because he never prescribed, nor could he prescribe any medication. However, the legislature has eliminated the defendant's ability to raise a defense based on an individual's class or inability to commit the crime.[8] Therefore, the fact that

8. 18 Pa.C.S. §306(e) states: "In any prosecution for an offense which criminal liability of the defendant is based upon the conduct of

defendant could not prescribe medication to patients is irrelevant. Even if this defense was considered, the court still maintains that the evidence demonstrates defendant assisted Dr. Wagman in carrying out the underlying offense. As previously stated, the aid provided by the accomplice need not be substantial as long as it was offered to assist him in committing or attempting to commit the crime. This court is persuaded by the Commonwealth's argument that defendant aided in the commission of the crime by "knowingly leaving patients at Dr. Wagman's doorstep who did not need treatment beyond that of chiropractic care, if any at all." Therefore, even though defendant did not write the prescriptions to the patients, he aided Dr. Wagman by providing patients that did not need his care. This court is convinced that the entire record illustrates defendant not only intended to facilitate or promote the underlying offense, but also actively participated in the commission of the crime by aiding Dr. Wagman in obtaining patients who were not in need of treatment.

In conclusion, this court is of the opinion that, when viewing the facts in light most favorable to the Commonwealth, there is sufficient evidence to uphold the conviction for accomplice liability.

### b. Conspiracy

The next issue the court must address is whether there was sufficient evidence for the jury to convict defendant

---

another person . . . it is no defense that the offense in question, as defined, can be committed only by a particular class or classes of persons, and the defendant, not belonging to such class or classes, is . . . legally incapable of committing the offense in an individual capacity."

of conspiracy to violate the Drug, Device and Cosmetic Act. Before a person may be convicted of conspiracy, the trier of fact must find:

"(1) the defendant intended to commit or aid in the commission of the criminal act;

"(2) the defendant entered into an agreement with another (a 'co-conspirator') to engage in the crime; and

"(3) the defendant or one or more of the other co-conspirators committed an overt act in furtherance of the agreed upon crime." *Commonwealth v. Murphy,* 577 Pa. 275, 292, 844 A.2d 1228, 1238 (2004). (citations omitted)

The initial analysis, whether the defendant intended to commit or aid in the commission of the underlying act, is the same as that provided for accomplice liability. First, "mere association with the perpetrators, mere presence at the scene, or mere knowledge of the crime is insufficient to establish that a defendant was part of a conspiratorial agreement to commit the crime." *Id.* quoting *Commonwealth v. Lambert,* 795 A.2d 1010, 1016 (Pa. Super. 2002). Rather, some additional evidence that the defendant intended to commit the crime with his co-conspirator must be established. *Id.* (citations omitted) As provided in detailed analysis for the accomplice liability charge, this court opines that the evidence establishes defendant's intent to commit the crime.

Additionally, this court is unpersuaded by defendant's contention that the absence of the direct exchange of money from Dr. Wagman to defendant prevents a finding that a conspiracy existed.[9] The Commonwealth cor-

---

9. Defendant contends that *Commonwealth v. Paolino,* 837 A.2d 1216 (Pa. Super. 2003) provides guiding principles in determining whether a conspiracy agreement existed. In *Paolino,* the defendant, an

rectly points out that existing case law does not require a direct exchange of proceeds from one co-conspirator to another to maintain a meritorious claim of conspiracy. Additionally, the Commonwealth highlights the fact that defendant still wallowed in financial gain as a result of the conspiracy.[10] Moreover, the conspiratorial arrangement was a daily routine continuing for approximately two years. The practice essentially became a "script mill" with a revolving door and defendant was making $25 every time a patient walked through, regardless of whether or not actual treatment was necessary.[11] These facts clearly manifest defendant's intent to enter into a conspiratorial agreement with Dr. Wagman. Thus, the first element is satisfied.

---

osteopathic physician, entered into an agreement whereby he would pay another osteopathic physician $2,500 per week in exchange for the ability to write prescriptions using their DEA number. Defendant contends that the case at bar is substantially different because: (1) he did not receive a direct exchange of money, (2) he maintained his own patient and financial records, and (3) co-defendant Wagman utilized his own DEA number when he wrote out prescriptions. However, this court has found no case law that supports defendant's proposition that these differences result in the inability to find the existence of a conspiracy agreement in the case at bar. Rather, this court finds that the facts defendant differentiates were only evidence germane to *Paolino* that allowed the court to find a conspiracy agreement. The court believes that the evidence presented in this case was sufficient to allow the fact-finder to determine a conspiracy agreement existed in accordance with established precedent.

10. The Commonwealth identifies the fact that defendant's practice grew from 10 patients per day to a maximum of 118 a day after the arrival of Dr. Wagman. As a result of this exponential growth, the defendant was making approximately $2,950 per day.

11. According to testimony provided by Anthony Villani, an ex-patient of the defendant, Dr. Wilkins would receive a fee from an office visit even if he did not provide treatment that day.

The distinguishing factor that separates conspiracy from accomplice liability is the requirement that there be an agreement between the co-conspirators. See *id.* (citations omitted) The Pennsylvania Supreme Court has recognized that direct proof of a conspiratorial agreement is rarely available. See *id.;* see also, *Commonwealth v. Jackson,* 506 Pa. 469, 485 A.2d 1102 (1984). Accordingly, such an agreement may be proven inferentially through a showing of the parties' relationship, conduct, or circumstances. *Jackson, supra,* 506 Pa. at 474, 485 A.2d at 1104. Evidence of the co-conspirators' overt acts is also sufficient to demonstrate proof of the conspiracy. *Id.*

In *Murphy, supra,* the Supreme Court affirmed the conspiracy conviction of the defendant for his involvement in a drug sale. In that case, the court determined that the circumstantial evidence allowed the jury to infer that an agreement existed between the defendant and the co-conspirator, whereby the defendant "would screen drug buyers before introducing them to [the drug dealer] based on [defendant's] acts of questioning the trooper and calling out to [the dealer], and the evidence that [the dealer] knew upon being called . . . that the trooper was interested in buying drugs." *Murphy,* 577 Pa. at 292-93, 844 A.2d at 1239. Additionally, the court concluded that the delivery of the drugs to the trooper satisfied the requirement that at least one conspirator must perform an overt act in furtherance of the underlying crime.

Although *Murphy* involved "street dealers," the case at hand can be resolved similarly. The jury could infer that an agreement existed between defendant and Dr. Wagman, in which defendant would screen potential patients by obtaining a case history and requesting x-rays and MRIs, and then immediately referring the patients

to Dr. Wagman for their narcotic prescription. Also it can be concluded that Dr. Wagman's act of prescribing the narcotics satisfies the requirement that there be an overt act. Therefore, this court is satisfied that enough evidence was presented for the jury to conclude that the elements of conspiracy existed.

In conclusion, this court asserts that there was sufficient evidence to sustain defendant's conviction for conspiracy to violate the Drug, Device and Cosmetic Act.

## II. *Weight of Evidence*

Finally, this court will address defendant's argument that the weight of the evidence does not support the verdict. Again, this court will demonstrate that the record provides a substantial amount of evidence to support the fact-finder's decision. Thus, this court insists that its decision to sustain the convictions is justified and must be upheld.

Under Pennsylvania law, the finder of fact exclusively determines the weight of the evidence and, therefore, may believe the testimony of a witness in full, partially, or not at all. *Lewis supra.* An appellate court must accept the fact-finder's decision unless "it is so contrary to the evidence as to shock one's sense of justice." *Id.* Additionally, when the trial court has already entertained a weight of the evidence claim, appellate review is limited to determine "whether the trial court palpably abused its discretion in ruling on the weight claim." *Id.*

As the record demonstrates, this court has rejected defendant's argument that his conviction was contrary to the weight of the evidence. This court determined that the testimony provided during the trial allowed the jury

to return a verdict of guilty. Although this court is mindful of defendant's contention that Mr. Lee's testimony should not have been provided any weight because it was impeached, the court recognizes that the function of the jury is to evaluate and determine the weight to be given to each witness. Thus, the court is persuaded that enough reliable evidence was introduced, even without consideration of Mr. Lee's testimony, during defendant's trial that would allow the jury to conclude that the Commonwealth established beyond a reasonable doubt the elements necessary for a finding of guilty on charges of accomplice liability and conspiracy.

This court emphasizes that the Superior Court review is limited to determine whether there was an abuse of discretion in denying defendant's weight claim and a new trial should only be granted if the verdict is "so contrary to the evidence as to shock one's sense of justice." *Commonwealth v. Miller,* 555 Pa. 354, 367, 724 A.2d 895, 901 (1999). However, if the appellate court finds support for the trial court's decision anywhere in the record, the trial court's decision must be affirmed. *Westinghouse Elevator Co. v. Herron,* 514 Pa. 252, 259, 523 A.2d 723, 727 (1987) ("If such support is to be found [in the record], the trial court must be affirmed, for in that event, it could not be said that the lower court palpably abused its discretion."). In light of the foregoing evidence, this court is confident that the Superior Court will find a plethora of reliable evidence to sustain the denial.

### III. *Conclusion*

Based on the foregoing analysis, this court asserts that defendant's contention that his conviction was against

the sufficiency and weight of the evidence must be denied. Thus, this court's decision to deny defendant's motion for a new trial must be affirmed.

This court requests that defendant's appeal be denied and the decision to deny defendant's post-trial motions on the basis of sufficiency and weight of the evidence upheld.

## ORDER

Now, January 18, 2007, an appeal having been filed in the above-captioned case by the defendant, Thomas Wilkins, the court directs that the attached opinion be filed to satisfy the requirements of Pa.R.A.P. 1925(a). The clerk of courts of Lawrence County is directed to immediately assemble the record and transmit said record to the Superior Court of Pennsylvania as required by the applicable Rules of Appellate Procedure.

The clerk of courts is directed to serve a copy of this order of court and attached opinion upon counsel of record, Jeffrey Baxter, Esquire and Carmen F. Lamancusa, Esquire.